# Richmond.

## PRESTON V. OTEY.

### December 3rd, 1891.

1. NEW TRIAL—*Verdict against evidence—Case at bar.*—In an action for money paid for defendant, he filed a set-off for keeping cattle at four cents a pound for increased weight, yet admitted that they were not weighed when delivered. Plaintiff claimed that defendant agreed to purchase cattle at their cost, and at end of the year sell them back at four cents a pound;

HELD:

> Defendant's admission was so inconsistent with his contention that the verdict in his favor should have been set aside as against the evidence.

2. IDEM—*After-discovered evidence not merely cumulative.*—Admissions of a party in direct conflict with his testimony and his theory of defence, and bearing on the issue, is not cumulative merely; and if his opponent had no reason to suspect its existence, and could not by reasonable diligence have discovered it before the trial, and if it would, if present, probably have produced a different verdict, the subsequent discovery thereof will entitle the latter to a new trial.

3. IDEM—*Case at bar.*—After-discovered testimony of witnesses that defendant told them the cattle were his, and he was to let plaintiff have them back in the fall at four cents a pound, though tending directly to establish plaintiff's version of the contract, is independent evidence, dissimilar in kind to that offered by him at the trial, which was the testimony of himself and agent as to what the contract was, and is not merely cumulative, and entitles plaintiff to a new trial.

Error to judgment of circuit court of Montgomery county, rendered May 19th, 1888, in an action for money paid as an accommodation endorser, wherein the plaintiff in error, William B. Preston, was plaintiff, G. C. Otey was defendant. Opinion states the case.

*W. R. Staples* and *Phlegar & Johnson*, for plaintiff in error.

*J. H. Hoge*, for defendant in error.

RICHARDSON, J., delivered the opinion of the court.

The object of this action was to recover money paid by said Preston as accommodation endorser for said Otey.

The action was brought to the October rules, 1886; and at the December term, 1886, the defendant pleaded *non-assumpsit* and payment, upon which plea issue was joined; and, on the defendant's motion, leave was given him to file a special plea and an account of set-offs in sixty days; and the cause was continued. And on the 2d day of February, 1887, the defendant filed the following account of set-offs:

WILLIAM BALLARD PRESTON,
1884 and 1885.              *In account with* G. C. OTEY:

To keeping, pasturing, feeding, and caring for 100
    yearling cattle from 1st October, 1884, to 1st
    January, 1885,        .      .      .      .      .      . $  300 00
To feeding, keeping, pasturing, and caring for 95
    head of cattle from 1st January, 1885, to No-
    vember 1st, 1885,   .      .      .      .      .      . 1,250 00
                                                           ─────────
                                                           $1,550 00

This account was endorsed: "This account is filed by G. C. Otey as a set-off to the action now pending against him in the circuit court of Montgomery county, in the name of William Ballard Preston, plaintiff, and will be relied upon by Otey as a set-off at the trial of the cause.

                              "G. C. OTEY,
                                   "*By his counsel.*"

Opinion.

The case was called for trial in the circuit court of Montgomery county on the 11th day of May, 1888, and the trial was then gone into. When the case was called for trial the defendant, Otey, filed with his said account of set-offs an additional item for increased weight of cattle—38,750 pounds at four cents per pound, making just $1,550. During said term, to-wit, on the 14th day of May, 1888, the jury returned the following verdict: "We, the jury, find for the plaintiff on his demand, and assess his damages at $785.77, and we find for the defendant on his plea of set-off, and assess his damages at $980.64, and we therefore find for the defendant the excess ascertained by us to be $194.87." And thereupon the plaintiff moved the court to set aside the verdict of the jury and to grant him a new trial, on the ground that the verdict was contrary to the evidence, which motion the court overruled, and thereupon proceeded to enter judgment according to the finding of the jury, to which action of the court the plaintiff excepted; and this is his bill of exceptions No. 1, in which the court certifies all the evidence adduced at the trial, and also the instructions given to the jury at the instance of the parties, respectively.

At a later day of the same term of the court, to-wit, on the 19th day of May, 1888, the plaintiff again moved the court to set aside said verdict and grant him a new trial on the ground of after-discovered evidence, and, in support of his motion, filed his own affidavit and those of James T. Evans and George P. Wall.

In his own sworn statement, the plaintiff, Preston, sets forth that he had no knowledge of the evidence detailed by James T. Evans and George P. Wall, set forth in the affidavits of said Evans and Wall, filed with the affidavit of said Preston, until after the verdict was rendered in this suit, and no reason to believe or suspect that such information was in their possession; and that he believes their statements are true, and that if they had been before the jury they would have found a different verdict.

The said affiant, James T. Evans, in his sworn declaration, which accompanies that of the plaintiff, Preston, says : " That being with G. C. Otey in the fall of 1884, some time after the cattle had been placed upon the farm of said Otey by said William Ballard ˙Preston, he, Evans, asked said Otey the following question : ' Cloyd, you are keeping some cattle for Ballard Preston, ain't you ? ' To which question Otey replied : ' No, they are my cattle ; I'm to let him have them back next fall at four cents per pound.' " And the affiant, Evans, further states that George P. Wall was present when the above conversation took place.

And in his affidavit George P. Wall declares that he was in company with James T. Evans, and heard Evans ask said Otey if he was not keeping some cattle for Ballard Preston, and that said Otey replied : " No, they are my cattle ; I'm to let him have them back next fall at four cents per pound." And the affiant says this conversation took place some time during the fall of 1884. And it was admitted that the affiant, Evans, was the same James T. Evans, who testified at the trial of the cause ; and that the item in defendant's account of set-offs for increased weight of cattle was not filed by him until the cause was called for hearing at the May term, 1888. But, in the face of this after-discovered evidence, the court overruled the plaintiff's second motion to set aside the verdict of the jury and grant him a new trial ; and to this action of the court the plaintiff also excepted ; and this is his bill of exceptions, No. 2. And the plaintiff obtained a writ of error.

There is no dispute as to the claim sued for by the plaintiff, Preston. The whole controversy is as to the set-off relied upon by the defendant, Otey, at the trial. In the fall of 1884, the said defendant took, without weighing, 100 head of yearling cattle from the plaintiff. The defendant claims that he was to have four cents per pound for the increased weight of the cattle while in his possession. The plaintiff claims that the contract was that the defendant, Otey, was to take the cattle at cost to the plaintiff, which was $30 per head, and that

the plaintiff, Preston, was to take them back the next fall at four cents per pound.

The real point in dispute is whether the defendant, Otey, took the cattle as his property, and re-sold them to the plaintiff, Preston, to be re-delivered to the plaintiff the succeeding fall at four cents per pound, or whether he took the cattle as the property of the plaintiff, and was to receive pay for keeping them. In other words, the controlling question is what was the contract between the parties? This is made perfectly clear by the first of the two instructions given by the court to the jury at the instance of the plaintiff, which is as follows: " The jury are not to determine the plea of set-off with regard to what it may have been worth to keep cattle by the month; all such evidence is excluded from them. They are to find on the plea of set-off what was the contract between the parties. If they find that the contract was that Colonel Preston was to pay Mr. Otey four cents a pound for number of pounds that they increased in weight while in Mr. Otey's possession, they must find how much they increased in weight, and allow the defendant four cents per pound for such increase. But if the jury find that the contract was that Mr. Otey would take the cattle at what they cost Colonel Preston, and that Preston would take them back in twelve months at four cents per pound, and that the cattle cost Colonel Preston $30 per head, they must find what they were worth at four cents per pound when taken back by Preston, and find for the defendant only the difference between such value and $30 per head."

It will be observed that the defendant's account of set-offs, as originally filed by him on the 2d of February, 1887, was made up of two items, one of which was $300 for keeping, pasturing, feeding and caring for 100 yearling cattle from 1st of October, 1884, to 1st of January, 1885; and the other— $1,250—for keeping, feeding, pasturing and caring for ninety-five head of cattle from 1st of January, 1885, to November 1st, 1885—the two items aggregating just $1,550. It appears that

.five of the original number of cattle died after they were taken
charge of by the defendant, Otey; hence the first item of $300
was for keeping 100 cattle, while the other item of $1,250 was
for keeping the remaining ninety-five head. It is not pre-
tended that the keeping of any other cattle was involved in
this controversy. It will be observed that the first item of $300,
for keeping 100 head of cattle for three months, was at the rate
of one dollar per head per month, and that at the same rate
the keeping of the ninety-five remaining cattle, for ten months,
would have amounted to just $950; yet the charge for the
latter period is $1,250, or at the unique rate of $1.30$\frac{3}{19}$ per
head per month. The object seems to have been to make the
account of set-offs foot up just $1,550. But this account of
set-offs was abandoned at the trial, and no evidence was offered
in support of it. However, when the case was called for trial,
and just on the eve of going into trial, the defendant, Otey,
filed an additional item for increased weight of cattle, 38,750
pounds, at four cents per pound, making again just $1,550.
To this last item all the evidence at the trial was addressed,
the question being what was the contract between the parties?

The burden of proof was on the defendant to establish the
contract upon which he relied to support his account of set-off,
and so the court told the jury in its first instructions, given at
the instance of the plaintiff.

Touching the contract between the parties, the defendant,
Otey, relied solely upon his own testimony, which, as certified,
was as follows: " That in the latter part of September or 1st
of October, 1884, Anderson Ledgerwood, the agent of plaintiff,
asked defendant, for plaintiff, if he would keep 100 head of
yearling cattle for plaintiff for twelve months for four cents
per pound for the weight defendant could put on them in that
time; that nothing was said about weighing them, but defen-
dant supposed that plaintiff had had them weighed; that the
cattle were then on defendant's father's and mother's land, which
defendant was managing and controlling in his own name;

that he told said Ledgerwood he would answer in a few days; that in a few days he informed plaintiff, at his office in Blacksburg, that he would accept his proposition, but the proposition was not repeated then, and nothing was said about the cost of the cattle, and he never knew until this suit was brought what they cost, and never asked what they weighed; that some of the cattle were sick when brought to his land; that five died; that they were well kept and cared for—fed all that defendant had for them, which was all they needed; that ninety-five head were weighed back to Preston in October, 1885, and weighed 77,710 pounds; that defendant was from home when this weighing was done; that he did not know of it until it was done; that his brother James attended to the weighing; that between the time the contract was made and cattle returned to Preston, defendant had been superseded in management of farm by his father and mother, and his father was managing the farm; that Preston and his agent visited and looked at the cattle repeatedly while they were at defendant's, and directed in regard to separation of some sick ones from the well ones; that Preston sent a request by him to his father, who was a physician, to treat the sick cattle; that they were an indifferent lot of yearling cattle—in very thin order when brought to him; that he understood the proposition made through Ledgerwood to refer to the same cattle which defendant kept and which were then on his father's and mother's place."

It is further certified that defendant introduced three other witnesses, who testified that the cattle were well kept; were in bad order when taken to defendant's place, and that a number were sick, and five died; that of said witnesses defendant's father also testified that plaintiff's agent, Ledgerwood, began to drive the cattle away the day Preston took them back, without any notice to any one at Otey's; that witness saw this and sent his son, Jimmie, to go and see them weighed; that witness had sent word before that to Preston

not to pay any more to defendant, but to settle with witness; and that the cattle would not have weighed over 600 pounds per head when brought there, and were not worth over $18 or $20 per head; that he had no claim against Preston on account of the cattle, but had sent him word not to pay any more to defendant without account. And that one of the three witnesses testified that the cattle would not weigh over 400 or 450 pounds. This is not only all the defendant's evidence touching what was the contract between the parties, but his evidence entire.

On behalf of the plaintiff, Anderson Ledgerwood testified "that the proposition he submitted to the defendant for the plaintiff was that defendant should take the cattle at cost, and the plaintiff take them back in twelve months at four cents per pound; that G. C. Otey said he would answer in a few days; that the cattle were then on Otey's land, being pastured at sixty cents a head per month; that witness did not then know the cost of the cattle, and nothing was said between him and Otey about what they cost or about weight; that they were a good lot of yearlings, and in fair order when delivered to Otey; that he. visited them several times to look after them at plaintiff's request; that they seemed to be tolerably well kept; that well kept cattle will increase from 300 to 400 pounds."

The plaintiff, Preston, himself testified "that a few days after he was at Otey's land looking after the cattle (some of which had sore tongue) having their tongues washed, that defendant rode through the field and said to plaintiff: ' I will accept your proposition,' also said he was in a hurry and went on; that nothing was then said about the cost; that not long after defendant came to plaintiff's office, in Blacksburg, to get him to endorse two of the notes aforesaid, and plaintiff then told him the cattle cost $30 per head, to which no reply was made as far as plaintiff recollects; that the 100 head were purchased in Bedford county; were topped out 168 cattle

raised on two of the best farms in that county, and in good
order when delivered to Mr. Otey; would have weighed 600
pounds per head; cost the plaintiff a little over $30 per head,
and were worth that much; that they were of good stock, and
if properly handled would have increased 350 pounds per
head in twelve months; that plaintiff kept sixty-seven of them
for twelve months after getting them back from Otey, and
then sold them for the Liverpool market; that only the best
cattle are sold for that market; that sore tongue is caused
either by excess or lack of salt, is not a dangerous disease,
does not kill cattle, is to cattle about what a gum-boil is to
a man."

J. T. Evans, another witness for the plaintiff, testified "that
he lived on a farm adjoining Otey, and that the cattle were in
good order when delivered at Otey's; were a good lot of cat-
tle; were not, in his opinion, well wintered; that he kept
seventeen head for Preston the next year, which were weighed
to him at 797, about a week after Otey delivered them to
Preston; that they were the next pick after Preston had got
out the sixty-seven he kept; that they were not on very good
grass when he got them from Preston; that he increased their
weight about 450 pounds in twelve months."

T. W. Spindle, another witness for the plaintiff, testified
"that he dealt largely in cattle in the fall of 1884; sold 160
yearlings in one lot, at $30 per head cash on delivery, which
he thinks would have weighed from 650 to 675 per head; that
yearlings sold from $18 to $35 per head that year, and that it
was not the custom to weigh yearlings; that sore tongue is
not a dangerous disease."

And J. T. Miller, another witness introduced by the plain-
tiff, testified "that sore tongue was not a dangerous disease,
and that yearlings in fall of 1884 sold at from $18 to $35 per
head, and he (witness) handled a good many yearlings." And
this was all the evidence.

In view of all the evidence, looked at from the stand-point
of the trial judge, and especially in the light of said first

instruction, given to the jury at the instance of the plaintiff, it is difficult to perceive upon what tenable ground the court below refused the plaintiff's first motion to set aside the verdict of the jury and grant him a new trial. Conceding that the witnesses on both sides were equally entitled to credit, there was unquestionably a clear preponderance of evidence in favor of the plaintiff as to the contract between the parties. For while the defendant, Otey, relies on his own statement only, that the contract was that he was to keep the cattle, as the property of the plaintiff, Preston, and was to receive from him four cents per pound for the increased weight he could put on them, Preston and his agent, Ledgerwood, both testify that the proposition made to Otey was that he should take the cattle at cost, and re-deliver them to Preston the next fall at four cents per pound; and it was proved by Preston that the cattle cost him $30 per head, and that Otey agreed to take them at that price, and to re-sell them to Preston at four cents per pound.

But, however this may be, the plaintiff is the exceptor, and, under section 3484, Code 1887, he is put in the attitude of a demurrant to evidence, and this court, however unjust the rule, must reject all the evidence of the plaintiff in conflict with that of the adversary, and give full force and credit to that of the latter, and to all reasonable inferences that may be deduced therefrom. But putting the plaintiff in the attitude of a demurrant to evidence, as we must do, and looking alone to the evidence of the defendant, it is still perfectly clear that the court below erred in overruling the plaintiff's said first motion to set aside said verdict and grant a new trial. For, while the defendant, Otey, testifies to his version of the contract—to-wit, that he was to keep the cattle at four cents per pound for the increased weight he could put on them—yet he admits that the cattle were not weighed to him, but he supposed the plaintiff, Preston, had weighed them. Is it credible that any sane, business-man would enter into a contract of such moment as that of pasturing, feeding, and caring for 100 head of cattle, at four

cents per pound for the increased weight for twelve months, without knowing, or even inquiring, how much the cattle weighed when he received them? We think not. It is obvious that this admission of the defendant, Otey, is utterly inconsistent with his version of the contract, but is entirely consistent with that of the plaintiff, Preston—to-wit, that the defendant was to take the cattle at cost—$30 per head, and re-deliver them to the plaintiff the next fall at four cents per pound. According to Preston's theory there was no necessity for weighing the cattle to Otey, but it was important to weigh them back to Preston, for Otey was entitled to four cents per pound for them, less the cost per head, and hence Preston weighed the cattle when he took them back. According to Otey's theory it was of the utmost importance that the cattle should be weighed to him, for without it, it was impossible to determine the increased weight at the end of the year he kept them. It cannot, therefore, in any just sense be said that the defendant, Otey, proved the contract relied on by him to sustain his plea of set-off, or that he proved any contract to warrant the finding of the jury. In other words, it is plain that the verdict of the jury is directly in the teeth of the direction of the court as embodied in said first instruction given for the plaintiff.

The plaintiff's second bill of exceptions involves a principle of some nicety, but one not difficult of application under the circumstances of this case. The question thus presented is whether or not the after-discovered evidence, upon which the plaintiff renewed his motion to set aside the verdict and grant a new trial, was merely cumulative evidence.

In discussing the general rule as to newly discovered evidence, it is said in Hilliard on New Trials: " So it is said in an early case, ' where a man has matter of defence, and, knowing thereof, goes to trial, and puts the plaintiff to the charge of proving his issue, he shall never after, in respect of that matter, have a new trial.' " And the other adds : " It must be made

to appear affirmatively that the evidence could not have been discovered by due, ordinary or reasonable diligence. A party who neglects to make a defence, known to him at the time when it should have been made, or to adduce evidence to substantiate it, of which he was then aware, or which he could have ascertained with reasonable diligence, and in consequence· of such neglect fails in the controversy, cannot subsequently renew it upon the discovery of additional testimony to establish such defence." Hilliard on New Trials, p. 496.

· It is clear that the after-discovered evidence in the present case does not come within either the reason or the letter of the rule above stated. The plaintiff's version of the contract was that the defendant took the cattle from him at cost ($30 per head) and was to let him have them back the next fall at four cents per pound. This contract, the plaintiff held himself ready to prove by the only person—himself and his agent, Ledgerwood, except the defendant, Otey, who knew what the contract was, and then two witnesses, if worthy of credit, clearly establish the contract as claimed by the plaintiff. The plaintiff had been led to believe from the defendant's account of set-offs, filed as early as the 2d day of February, 1887, that the latter would rely upon same at the trial, and he· was ready with his own testimony and that of his agent, Ledgerwood, to show what the real contract was, and that there was no contract upon which to predicate the defendant's said account of set-offs. But on the trial, or on the eve of going into the trial, on the 11th day of May, 1888, the defendant suddenly changes front, files an additional item· of set-off for 38,750 pounds, increased weight of cattle that had never been weighed to. him, which, at four cents per pound, made $1,550; and this was the issue to which all the evidence was addressed, the plaintiff being armed with his own testimony and that of his agent, Ledgerwood, the only persons, except the defendant, Otey, who knew what the contract was, felt that he could safely go into trial, he having, as he states in his affidavit, no reason to believe or

suspect the existence of the after-discovered evidence. And accompanying his said affidavit, in support of his second motion to set aside the verdict and grant a new trial, were the sworn declarations of James T. Evans, who testified at the trial, and of George P. Wall, who did not so testify, both of whom say, in effect, that in a conversation between said Evans and the defendant, Otey, in the fall of 1884, the latter said that the cattle in question were his (Otey's) cattle and that he was to let Preston have them back the next fall at four cents per pound. Here was an admission by the defendant directly in conflict with his testimony on the trial. If these be credible witnesses, and their testimony had been known and had been introduced on the trial, it is impossible to suppose that the verdict would not have been different.

Now, what is the law applicable to such a state of facts? In Hilliard on New Trials, p. 504, § 17, it is said: "But although the rule that a new trial will not be granted on the ground of newly-discovered cumulative evidence, is a rule that will be relaxed with great caution; yet it is said ' The court ought not to shut their eyes to injustice on account of facility of abuse in cases of this sort.'" And says the author, "It is sometimes held that they will not refuse a new trial on the ground of newly-discovered evidence, for the reason that such evidence is cumulative merely, if it is sufficient to render clear that which before was a doubtful case. Or in a nicely balanced case. Or if it is conclusive. Or of such a character as *prima facie* to raise a strong probability that it will be decisive of the case."

This doctrine was quoted with approval and applied by this court in the case of *St. John's Ex'ors* v. *Alderson*, 32 Gratt. 140, where it was held that "in determining whether or not evidence is *cumulative*, the courts must see if the *kind and character* of the facts offered, and those adduced on the former trial are the same, and not whether they tend to produce the same effect. That it is their resemblance that makes them *cumula-*

*tive.* And that the facts may tend to prove the same proposition, and yet be so *dissimilar in kind* as to afford no pretence for saying they are *cumulative.*"

In the case last referred to, Judge Christian quotes with approval from the opinion in *Guyot* v. *Butts,* 4 Wend. 579, where Marey, J., said : "I find no case in which a very distinct definition is given of cumulative evidence. The courts have sometimes used expressions seeming to warrant the inference that proof which goes to establish the same issue that the evidence on the first trial was introduced to establish is cumulative. If the evidence newly-discovered, as well as that introduced on the trial, had a direct bearing on the issue, it may be cumulative. But we are not to look at the effect to be produced as furnishing a criterion by which all doubts in relation to this kind of evidence are to be settled. *The kind and character of the facts make the distinction.* It is their resemblance that makes them cumulative. The facts may tend to prove the same proposition, and yet be so *dissimilar in kind* as to afford no pretence for saying they are cumulative."

In the present case the after-discovered evidence, though tending directly to establish the plaintiff's version of the contract in question, and although it would probably be conclusive of that issue, is yet not cumulative merely, but is independent evidence *dissimilar in kind* to that on the first trial. It is direct evidence of admission by the defendant in conflict with his evidence on the trial. Hence, in Hilliard, on New Trials, p. 502, note a, it is said : "Admissions and conversations of a defendant, in direct conflict with his testimony and with the theory of his defence, are not impeaching but original evidence, citing *Alger* v. *Murritt,* 16 Iowa, 121. Evidence which is specifically distinct and bears upon the issue is not cumulative, though it may be intimately connected with parts of the other testimony. *Ibid.*"

It is clear that the after-discovered evidence in the present case is not cumulative merely, that the plaintiff had no reason

even to suspect its existence, and therefore cannot be said to have been wanting in the exercise of ordinary diligence. We are, therefore, of opinion that the court below erred in refusing to set aside the verdict of the jury and to grant a new trial, on the ground of after-discovered evidence, as well as on the ground that the verdict was contrary to the evidence. For the reasons aforesaid the judgment of the court below must be reversed and annulled, the verdict of the jury set aside, and the cause remanded to said circuit court, for a new trial to be had therein in accordance with the views expressed in this opinion.

JUDGMENT REVERSED.